**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**ELIZABETH ANDERSON-WILSON,**

      **Plaintiff,**

**vs.**                                              **Case No. 1:11cv57-WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


**<u>MEMORANDUM OPINION</u>**

This is a social security case referred to me upon consent of the parties and reference by District Judge Paul.  Doc. 211.   It is concluded that the decision of the Commissioner should be reversed and remanded.

**Procedural status of the case**

Plaintiff, Elizabeth Anderson-Wilson, applied for disability insurance benefits and supplemental security income benefits.  Her last date of insured status for disability benefits was December 31, 2010.  Plaintiff alleges disability due to fibromyalgia, low back pain secondary to degenerative disc disease, depression, anxiety, right shoulder

pain, and carpal tunnel syndrome, with onset on August 10, 2005.  Plaintiff was 45 years of age on July 22, 2008, the date of the commencement of the administrative hearing, has a 12th grade equivalency education, and has past relevant work as a flooring salesperson and a medical billing clerk.

The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a range of medium work, limited to occasional fine fingering, access to the restroom every 2 to 2 1/2 hours, performed wearing an incontinence protection pad, and with no executive or management decision-making.  R. 63.  The ALJ then determined that Plaintiff can still perform her past relevant work as a flooring salesperson (light exertion, semiskilled) and a medical billing clerk (sedentary, semiskilled), can also other jobs identified by the vocational expert, and thus was not disabled.  R. 70-71.

**Legal standards guiding judicial review**

The issue is whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). [1]

---

[1] "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8

A disability is a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

---

(11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[2]

At the first portion of the hearing, held on July 22, 2008, Plaintiff testified that she

had been fired from her job in August, 2005, and when her unemployment

compensation ran out, she applied for social security disability benefits.  R. 821-822.

She was 45 years old on the date of the hearing.  R. 823.  She said she was left handed

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs. Information about medical terms and prescription drugs come from MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

and had completed her GED.  *Id.*  Plaintiff said that prior to leaving her employment, her

most serious impairments were fibromyalgia and depression.  R. 833.  She said she

also suffered from anxiety.  R. 835.  She said she went to the hospital in 2003 for

treatment for an anxiety attack.  *Id.*  She said she also had degenerative arthritis in her

shoulder.  R. 836.  She said she had pain in her shoulder and elbow, but that her

physicians said they could not do anything about it, that it was mostly a result of

fibromyalgia.  R. 837-838.  Plaintiff said that she also suffers from impaired ability to

concentrate, and she said that she had been diagnosed with attention deficit

hyperactivity disorder (ADHD).  R. 839.  The ALJ said that he thought that ADHD is a

childhood disease, but ADD is an adult disease.  R. 840.  Plaintiff also testified that she

suffered from severe headaches.  R. 843.  She said that recently, Dr. Bailey had said

that her headaches were caused by neck and back problems.  *Id.*  She said she also

suffers from incontinence and high blood pressure.  R. 846-847.  Plaintiff said that the

medications she takes make her tired and nauseous.  R. 848.  She said that her

fibromyalgia makes her extremely tired, and she cannot sleep at night.  *Id.*  She said

she takes neurontin for restless leg syndrome.  R. 848-849.

The hearing continued on November 20, 2008.  R. 852.  Plaintiff said that

neurontin had been discontinued in September.  R. 855.  She had started taking

Baclofen, which she thought was causing dizziness, weakness, headaches, nausea,

and irritability.  R. 855.  She said she needed help when she dressed if buttons were

involved.  *Id.*  She said she could prepare a simple meal and could drive a motor

vehicle.  R. 855-856.  She said that dusting was painful in her arms, shoulder, and neck.

R. 856.  She thought that it would be difficult to sweep, vacuum, or mop a room due to pain in her legs, back, and shoulders.  *Id.*  She said that washing dishes was difficult because she could not stand for very long.  R. 857.  She said she could remove the trash from a container and shop for groceries, by shopping was difficult.  *Id.*  She did not use a cane to walk.  R. 858.  During the day, Plaintiff said she watched television for a couple of hours, and had access to the internet on a computer and used the internet.  R. 858-859.  She said that she tried to visit her mother-in-law across the street twice a day. R. 860.  She said that in 2007, she went with her daughter to Indiana for a visit with her family and her daughter drove.  R. 863.  They stayed two weeks.  R. 864.

Plaintiff said that her pain was a big problem, and that she felt like she had flu all of the time all over her body.  R. 866.  She said that it is hard for her to walk because walking creates muscle spasms and pain "all over."  R. 867.  She said that sometime she can go down her steps, sometimes she can cross the street to her mother-in-law's home, and sometimes she can walk to the mailbox.  R. 868.  She said she could sit for only about 15 to 30 minutes.  *Id.*  The most comfortable position was lying down with a heating pad.  *Id.*  She said that her hands tingled, felt "dead," and she had problems with manipulation.  R. 869.  She planned to have bilateral carpal tunnel syndrome surgery.  *Id.*

Plaintiff's representative asked Plaintiff to describe how she does laundry, and she said she had a chair by the washer and puts clothing into the washer.  R. 870.  She said she cannot put the clothes into the dryer or remove them from the dryer, but she

can fold them if someone brings them to her.  *Id.*  She could not make her bed, clean, or iron.  R. 870-871.

The ALJ asked the vocational expert to assume a claimant who was 46 years old, with a general education diploma, with past relevant work as a flooring sales person, a clerk, inventory clerk, and medical billing clerk.  R. 874-876.  The expert categorized the flooring sales job as a light duty job, SVP 4, and the medical billing clerk job as sedentary, SVP 3.[3]  R. 879, 881.  The vocational expert was asked to assume a hypothetical person who was limited to light work, must avoid ropes and ladders, and must have a sit or stand option, up to five times an hour, for sedentary work.  R. 881. The expert was further asked to assume that the person needed to have the opportunity to go to the bathroom at 2 to 2 1/2 hour intervals, could do no executive or management work, and was limited to simple, routine work at the low semi-skilled level.  R. 881-882. The vocational expert said that such a person could perform Plaintiff's past relevant work as a flooring sales person and a medical billing clerk.  R. 882-884.  The expert said that the hypothetical person could also do light work jobs as a sales attendant or a recreation aide, or the sedentary job of surveillance system monitor.  R. 885-886.  The expert said that if the limitation imposed by Dr. DePaz existed, that Plaintiff can work only 20 hours a week, then there are no jobs in the national economy which she can do, and she would be unemployable.  R. 889.  The expert also said that if a person cannot

---

[3] "The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available at 2000 WL 1898704.

walk up to two hours a day, he or she cannot even do sedentary work.  R. 890.  The ALJ noted that sedentary work only requires an ability to walk up to two hours a day, but agreed that inability to walk more than 10 feet would preclude all kinds of work.  R. 890-892.

**Medical evidence**

A medical note dated April 19, 2001, probably from the Alachua County Health Department, states that Plaintiff had a long history of muscle pain, diagnosed as fibromyalgia, and right shoulder and low back pain.  R. 522.

Plaintiff had a lumbar MRI on April 19, 2001.  R. 678.  At L4-5 there was marked disc desiccation, and broad left foraminal and extra-foraminal disc protrusion, but without nerve root impingement.  *Id.*  An annular tear was found at L3-4, but without disc bulge or protrusion.  *Id.*  An MRI the same day of Plaintiff's thoracic spin revealed mild degenerative changes.  R. 679.

On June 4, 2001, Plaintiff complained of anxiety and back pain.  R. 523.  The diagnosis was anxiety, fibromyalgia, and gastritis.  *Id.*

On November 5, 2002, Plaintiff was seen by a physician with the initials "KWK."  R. 313-314.  She had been referred from vocational rehabilitation with chronic back pain.  R. 313.  He noted that Plaintiff had had a long history of chronic pain throughout her spine, radiating into her hips and shoulders, bilaterally.  *Id.*  He noted that she had been managed by Dr. Scott for fibromyalgia.  *Id.*  She said that she was able to tolerate work as a flooring installer due to the varied positions, but could not tolerate sitting for a prolonged period of time.  *Id.*  Multiple medications had not helped.  *Id.*  On

examination, the physician found Plaintiff to be in "no acute distress," with diffuse tenderness in the paraspinal muscles and into the trapezius and hip regions, but with no motor or sensory deficits.  *Id.*  He noted that the results of MRIs were normal in the cervical, thoracic, and lumbar spinal regions, with minimal degenerative changes at L4-L5.  *Id.*  His diagnosis was fibromyalgia and chronic pain.  *Id.*  He referred her to rehabilitation medicine.  R. 314.  He thought that surgery for a rotator cuff tear and mild impingement was not indicated since Plaintiff had fibromyalgia.  *Id.*  The physician referred Plaintiff to Dr. Oscar DePaz for pain management and further potential rehabilitation and copied him with the report.  *Id.*  Dr. DePaz works with other physicians in Rehabilitation Medicine Associates, P.A.  R. 312.

On February 13, 2003, Plaintiff had a psychological evaluation for vocational rehabilitation by Ernest J. Bordini, Ph.D., and Judith Migoya, Psy.D., a neuropsychology resident.  R. 283-293.  Plaintiff felt that she had never been able to reach her potential due to emotional problems and chronic pain.  R. 283.  Her father had been physically and emotionally abusive when she was a child, and Plaintiff ran away from home at age 14 with her boyfriend.  R. 284.  She obtained her GED at age 18 and she married her boyfriend at that age.  *Id.*  Her husband was in prison for years, and she raised her daughter on her own.  *Id.*  She reported that she was able to drive, cook meals, keep a checkbook, do laundry, and manage her own finances.  R. 285.  She admitted difficulties at work due to absenteeism, tardiness, and problems with sustaining employment in general.  *Id.*  She reported that she was uncomfortable around new people.  *Id.*  She described a history of depression and anxiety since childhood, and fair

health.  *Id.* and R. 286.  She reported chronic headaches, and chronic pain in her hands, arms, shoulders, legs, fee, back, buttocks, neck, chest, and face associated with fibromyalgia.  R. 287.  She also complained of problems with concentration and memory.  *Id.*

On examination, no significant pain behaviors were noted.  *Id.*  She was found to have adequate concentration and memory, both immediate and remote, on testing.  *Id.*  Her mood appeared to be anxious and depressed, and she was tearful throughout the interview.  R. 288.  She said her depression had grown worse over the last six months.  *Id.*  She reported moderate symptoms of depression and anxiety.  *Id.*  Her score on the depression scale was significantly elevated.  R. 290.  On testing, her reading ability was average.  R. 289.  Her somatic complaint score was elevated, "suggesting an unusual degree of concern about physical functioning and health matters and probable impairment arising from somatic symptoms."  *Id.*  It was found that her "self-image may be largely influenced by a belief that she is handicapped by her poor health."  *Id.*  It was concluded that Plaintiff's "tendency to convert psychological conflicts to physical symptoms is a contributor to her chronic physical problems."  R. 292.  Her score on the anxiety scale was also significantly elevated.  R. 289.  It was found that she "is likely to be plagued by worry to the degree that her ability to concentrate and attend are significantly compromised."  *Id.*  It was found that "[o]vert physical signs of tension and stress, such as sweaty palms, trembling hands, complaints of irregular heartbeats, and shortness of breath, are also present."  *Id.*  Plaintiff's score on the schizophrenia scale was also significantly elevated, with a predication that she would be socially isolated,

and her thought processes would be marked by confusion, distraction, and difficulty in concentration.  R. 290.  The diagnosis was major depression, severe, recurrent; somatization disorder; anxiety disorder, NOS; borderline personality disorder; fibromyalgia, chronic fatigue syndrome, headaches, arthritis and a history of head and back injuries.  R. 292.  Individual psychotherapy was recommended.  *Id.*

On February 18, 2003, Plaintiff was seen by Anuj Sharma, D.O., and Dr. DePaz. R. 309, 307.  Dr. Sharma reported that Plaintiff said that Dr. Brock had diagnosed fibromyalgia, but he thought that Plaintiff had "a very poor understanding of what fibromyalgia is."  *Id.*  He noted that her pain was "all over," and not associated with trauma.  *Id.*  Plaintiff was then working as a flooring installer and denied that she had any disability.  R. 310.  On examination, Dr. Sharma found that Plaintiff had pain with end stage range of motion bilaterally in the shoulders, but otherwise had full range of motion in the extremities.  *Id.*  Dr. Sharma detected "acute tender points" on palpation bilaterally at the medial epicondyle, lateral epicondyle, bicipital tendons, T2 interspaces, the greater trochanters, and the pes anserine bursa, and on the thoracic, cervical, and lumbar spine, R. 310-311, which appears to be 15 trigger points, counting each bilateral trigger point as two.  Spurling's maneuver and straight leg raising were negative, and her motor strength was intact.  R. 311.  Dr. Sharma's diagnosis was fibromyalgia and cervical and lumbar spondylosis.  *Id.*  He said that Plaintiff's symptoms matched a diagnosis of fibromyalgia "almost perfectly."  *Id.*  He prescribed Ambien for sleep, Skelaxin for muscle relaxation, and stretching and aerobic exercises for fibromyalgia. *Id.*

On March 1, 2004, Plaintiff was seen by Runi A. Foster, M.D., for a pulmonary consultation.  R. 383.  She had been experiencing chest pains and shortness of breath. R. 383-384.  She said she could do only minimal activities at home.  R. 384.  She smoked one half of a pack of cigarettes per day and had done so for 30 years.  *Id*.  She continued to suffer pain in her muscles and joints secondary to fibromyalgia.  *Id*.  It was thought that she had mild chronic obstructive pulmonary disease due to tobacco use. R. 385.  Advair for breathing was prescribed, and Plaintiff was to use albuterol as needed and was to quit smoking as soon as possible.  R. 386.

Plaintiff sought mental health counseling on March 2, 2004, from Susan Addis, Ph.D.  R. 295-296.  Plaintiff said that she was unable to tolerate sitting or standing at work for long periods of time, and she said that anxiety in talking to people was taxing. R. 296.  She had experienced periods of inattention.  *Id*.  The diagnosis was major depress, severe, recurrent; anxiety disorder, NOS; and rule out attention deficit hyperactivity disorder.  R. 295.  A GAF score of 55[4] was assigned.  *Id*.  On March 12, 2004, Plaintiff returned to Dr. Addis.  R. 294.  Dr. Addis found that Plaintiff was "obviously in a great deal of pain with her back."  *Id*.  She "was moving slowly and finding it hard to function."  *Id*.  She thought that a physician could not operate on her back to relieve the pain because she had fibromyalgia.  *Id*.  Dr. Addis recommended that Plaintiff be evaluated by a psychiatrist for attention deficit disorder.  *Id*.

---

[4] A GAF (Global Assessment of Functioning) score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers).  *See,* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

On March 3, 2004, Plaintiff was seen by Dr. DePaz, who noted that she had

been seen in rehabilitation medicine on February 18, 2003, by Dr. Sharma.  R. 307.

She had not yet been to physical therapy.  *Id.*  She complained of tingling in her left leg

with weakness and aches.  *Id.*  Plaintiff denied any disability for work.  *Id.*  On

examination, Dr. DePaz found that neural foraminal compression on the left produced

aching and tingling down the left.  R. 308.  Plaintiff was more tender on the left

paralumbar side, and had only "tentative" range of motion of her back.  *Id.*  A trial of

Ativan was prescribed.  *Id.*

On March 15, 2004, Plaintiff was seen by the Alachua County Health Department

complaining of severe lumbosacral and lower thoracic pain, with bowel and urinary

incontinence.  R. 463.  It was observed that she was unable to sit up due to severe pain.

*Id.*  She was found to have decreased range of motion in her back with "3+" tenderness

in her lumbosacral and thoracic lumbar regions.  *Id.*  An MRI was ordered.  *Id.*

On April 9, 2004, Plaintiff returned to see Dr. DePaz.  R. 304.  She continued to

have back pain radiating into her left leg.  *Id.*  She was also having problems with

bladder and bowel control.  *Id.*  An MRI had been taken on March 18, 2004.  *Id.* and R.

553-554.  It revealed a left asymmetric annular bulge at L4-L5, without evidence of focal

herniation.  *Id.*  The neuroforamen appeared to be significantly compromised, but with

no nerve root compromise.  *Id.*  Other lumbar levels were normal.[5]  *Id.*  Plaintiff was

currently working as a self-employed flooring installer.  *Id.*  On examination, her gait and

station were normal, and her spine showed no deformity.  *Id.*  Dr. DePaz again found

---

[5] The MRI finding was "stable appearance of mild degenerative left asymmetric disk
bulging at L4-5."  R. 554.

that neuroforaminal compression on the left was positive for pain, and Plaintiff had some decreased sensation and some weakness in her left leg.  *Id.*  EMG and nerve conduction studies were normal, and thus there was no electrophysiological evidence consistent with chronic radiculopathy.  *Id.*  An epidural injection at L4-L5 was planned.  *Id.*  The injection occurred on October 8, 2004.  R. 303, 297.

On October 18, 2004, Plaintiff was seen again by the Alachua County Health Department.  R. 458.  She complained of pain in her left buttocks down her left leg.  *Id.*  Straight leg raising was tender in the left buttocks.  *Id.*  An assessment of multiple somatic complaints, including headaches, a history of fibromyalgia, sciatica, depression, and an over active bladder.  *Id.*

On November 11, 2004, Plaintiff returned to Dr. DePaz.  R. 300.  She was having increased neck pain with numbness in her arms.  *Id.*  On examination, she was found to be tender to palpation in the paralumbar region, and slow, tentative motion of her neck.  R. 301.  An MRI of her cervical spine was planned.  *Id.*

On January 19, 2005, Plaintiff had a cervical MRI.  R. 315.  The impression was a small to moderate right posterolateral disk protrusion at C5-C6 causing mild cord compression and mild right neural foraminal narrowing.  *Id.*

On May 23, 2005, Plaintiff was seen again by Dr. DePaz for follow-up electrophysiological studies..  R. 298.  He noted that she was last seen on April 11, 2005, with diagnoses of fibromyalgia and spondylosis in the cervical and lumbar spine.  *Id.*  It was noted that the most recent MRI had shown a small right posterolateral disc protrusion at C5-C6.  *Id.*  An EMG of the "RUE" (right upper extremity), including

cervical paraspinal muscles, was normal.  *Id.*  The results of nerve conduction studies

were abnormal for the right upper extremity, including associated paraspinal muscles,

the bilateral median nerves, but was normal for the right ulnar nerve.  R. 299.  The

diagnosis was mild bilateral carpal tunnel syndrome.  *Id.*  There was no evidence of

cervical radiculopathy.  *Id.*

On October 24, 2005, Plaintiff reported to the Alachua County Health Department

that she had spells of fatigue and near syncope, sharp substernal pain, nausea, and

heart burn.  R. 445.  The assessment was depression, bradycardia,[6] near syncope, and

fatigue.  *Id.*  She was encouraged to quit smoking.  R. 446.

On March 27, 2006, Plaintiff complained of wrist and forearm pain, and was

assessed as having depression and chronic pain.  R. 431.  On May 3, 2006, she sought

treatment for a migraine headache.  R. 432.  On June 7, 2006, she complained of

severe neck pain and heart palpitations.  R. 429.

On May 10, 2006, Plaintiff had a consultative mental health evaluation by Andrés

Nazario, Jr., Ph.D.  R. 317-319.  She drove herself to the examination and she walked

without difficulty.  R. 317.  She asserted that she was disabled due to depression and

physical problems.  *Id.*  Plaintiff said that she had fibromyalgia, two herniated discs,

asthma, COPD, and other medical problems, and a history of depression and anxiety.

*Id.*  She was then taking Skelaxin, Combivent (two puffs a day), Alavert, Lorazepam,

Calan, Hydrocodone, Magoxine, Promethazine, Imitrex, and Cymbalta.  R. 318.  Plaintiff

said she could shop for groceries with help, and could take care of her personal

---

[6] Bradycardia is relatively slow heart action whether physiological or pathological. MEDLINE PLUS (MERRIAM-WEBSTER).

hygiene.  *Id.*  She said she could cook, clean house, do laundry, wash dishes, and could

do some yard work, but that it took a long time to accomplish any of this work.  *Id.*  She

said that she cries every day.  *Id.*  She said that she either sits or walks during the day,

and smokes a lot.  *Id.*  She said she takes care of household chores, visits her mother-

in-law across the street, goes to doctor's appointments, picks up medications, and visits

with her daughter.  *Id.*  Plaintiff's mood was "somewhat depressed" during the interview.

R. 319.  Her memory was intact.  *Id.*  She did not exhibit any significant deficits in other

testing.  *Id.*  It was noted that Plaintiff appeared to be able to concentrate, understand

and follow directions, and interact with others properly.  *Id.*  She said that Cymbalta[7]

was working well for her.  *Id.*  A diagnosis of dysthymic disorder,[8] early onset, and mild

posttraumatic stress disorder by presentation and records was entered.  *Id.*

On May 16, 2006, Plaintiff had a consultative medical evaluation by Eftim

Adhami, M.D.  R. 320-321.  Plaintiff said that she was not working due to "constant

grinding back and neck pain" which interfered with her sleep and caused her to be

chronically fatigued.  R. 320.  She said she had to frequently change positions due to

pain.  *Id.*  She said that a Jacuzzi or a TENS unit held but that exertion exacerbated the

condition ("repeats the cycle" of worsening after relief).  *Id.*  Plaintiff said that she had

---

[7] Cymbalta is used to treat major depression, diabetic neuropathy (a painful nerve disorder associated with diabetes that affects the hands, legs, and feet), generalized anxiety disorder, and fibromyalgia (a condition characterized by weakness and pain in the muscles and tissues surrounding the joints).  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[8] Dysthymia (dysthymic disorder) is a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem).  MEDLINE PLUS (MERRIAM-WEBSTER).

worked with this pain since she suffered two injuries in the 1980s, but in the prior nine

months, the intensity of the pain had become too great to work. *Id.* She said that her

accumulated sleep deprivation "made her fatigue overwhelming." *Id.* She had been

hospitalized in 2003 for anxiety and heart palpitations. *Id.* Her flooring installation job

had become too strenuous. *Id.* She had tried to work in flooring sales, but that ended

in August, 2005. *Id.* On examination, Romberg's sign[9] was negative, there was no

lumbar muscle spasm, straight leg raising testing was normal on both sides, sensation

was normal throughout the body, muscle strength was intact (5/5) in all muscles, there

was no muscle atrophy, and Plaintiff had the ability to pick up small objects and to

button clothes. R. 320-321. Dr. Adhami said, incorrectly, that Plaintiff is right handed.[10]

R. 321. Dr. Adhami's diagnosis was mild degenerative disk disease of the neck,

thoracic, and lumbar spine, stable COPD, occasional migraine headaches, carpal tunnel

syndrome, currently not symptomatic, and stable depression and anxiety, under

treatment. *Id.*

On September 8, 2006, Plaintiff was treated at the Alachua County Health

Department for depression, anxiety, and fibromyalgia. R. 424. She also complained of

fatigue and decreased desire in daily activities. *Id.* She appeared to be anxious and

sad, and began to cry during the interview. R. 426. The assessment was depression

---

[9] Romberg's signs is a swaying of the body or falling when standing with the feet
close together and the eyes closed; the result of loss of joint position sense. DORLAND'S
MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[10] Plaintiff testified that she is left handed.

and anxiety, a history of fibromyalgia, and possible panic attacks. *Id.* The record is signed by Dr. Ernesto J. LaMadrid. *Id.* (Compare the hand written initials to R. 730.)

On December 15, 2006, Plaintiff was seen by James J. O'Meara, M.D., for a cardiac consultation because she had had a history of palpitations and atypical chest pain. R. 348-349. Her palpitations were intermittent throughout the day, and sometimes were accompanied with dizziness. *Id.* She said that the onset of chest pain and shortness of breath occurred after her daily 30 minute walk in the morning, and lasted about 30 minutes. *Id.* Test results from an echocardiogram and an EKG were normal. R. 349. Dr. O'Meara determined that Plaintiff's palpitations were probably benign and were related to her smoking. *Id.* He thought her history of fibromyalgia was questionable and that her chronic obstructive pulmonary disease was related to smoking. *Id.*

On January 10, 2007, Dr. LaMadrid filled out a mental health report for the division of disability determinations. R. 421-422. Depressed mood, poor concentration, and poor immediate and recent memory were noted. R. 421. Plaintiff was thought to have a poor attitude. R. 422. The diagnosis was major depression, in treatment. *Id.* It was thought that she needed a structured job with a schedule, but it was also thought that she "may not work due to unstable depression." *Id.* She was found to have diminished strength in her hands and arms, and significantly diminished strength (2/5) in her hips and legs. R. 423. It was found that Plaintiff cannot squat, or walk on her toes or heels. *Id.*

An MRI was taken on January 16, 2007, of Plaintiff's lumbar spine.  R. 546.  The results appear to be much the same as previous imaging.  Plaintiff still had a broad based left foraminal and posterolateral disk protrusion at L4-L5 with mild left foraminal annular fissure, but with no obvious compromise of the nerve root, and a tiny right anterolateral annular fissure of the L3-L4 disk.  *Id.*  An MRI of her thoracic spine which revealed mild multilevel thoracic spondylosis, but without significant abnormality.  R. 547.  An MRI of her cervical spine revealed mild ridging and disk bulging at C5-C6, read as mild degenerative disk disease at C5-C6 with no significant disk herniation or canal or foraminal stenosis.  R. 548.

On January 30, 2007, Plaintiff was seen by Robert A. Greenberg, M.D., on a consultative basis.  R. 666-669.  Plaintiff complained of shortness of breath on walking (she continued to smoke tobacco), chronic severe pain and fatigue from fibromyalgia, bilateral carpal tunnel syndrome (worse on the left, and she is left handed), and injuries from motor vehicle accidents in 1979 and 1982.  R. 666.  On examination, Dr. Greenberg found that Plaintiff's breath sounds were diminished, suggesting COPD.  *Id.* Her heart had normal sinus rhythm.  R. 667.  He found that Plaintiff had decreased range of motion of her cervical spine, left shoulder, lumbar spine, and hips, but full range of motion of other joints.  *Id.*  He measured decreased grip strength, 4/5, and decreased left leg strength, 4/5.  *Id.*  He found that straight leg raising was positive for pain bilaterally at 15 degrees, but Plaintiff's gait and station were normal.  *Id.*  Plaintiff had trouble walking on her heels.  *Id.*  He found no evidence of active, inflammatory arthritis.  *Id.*  Dr. Greenberg determined that fine manipulation of Plaintiff's hands was

normal.  *Id.*  His diagnosis was fibromyalgia, shortness of breath secondary to cigarette

smoking (he suggested further testing), bilateral carpal tunnel syndrome, and probably

osteoarthritis of the cervical spine, lumbar spine, hips, and left shoulder as a result of

previous injuries.  *Id.*

On May 21, 2007, Plaintiff returned to the Alachua County Health Department.

R. 417.  She was crying and appeared to be in moderate discomfort.  *Id.*  Her back had

limited range of motion with pain and kyphosis.[11]  *Id.*  She also complained of major

depressive disorder and inability to sleep.  *Id.*

On June 21, 2007, Dr. LaMadrid signed a "Disability Benefit Activation Form"

stating his opinion that Plaintiff is totally and permanently "disabled" and likely never to

return to work in any occupation.  R. 730.  The diagnosis was fibromyalgia.  *Id.*

On September 6, 2007, Plaintiff was again seen at the Health Department for

follow-up and medications.  R. 413.  She had an appointment at "Meridian" (Meridian

Behavioral HealthCare, Inc.) for treatment of depression and anxiety.  *Id.*  She had been

having crying spells and  was unable to control her bowels.  *Id.*  She was diagnosed as

having depression and migraine headaches.  R. 414.  The record is signed by Dr.

LaMadrid.  *Id.*

On November 9, 2007, she returned again to the Health Department.  R. 411.

She needed a refill of Darvocet for lower back pain and Cymbalta.  *Id.*  Depression,

---

[11] Kyphosis is the abnormally increased convexity in the curvature of the thoracic
spine as viewed from the side; called also hunchback.  DORLAND'S MEDICAL DICTIONARY
FOR HEALTHCARE CONSUMERS.

chronic back pain, thoracic spondylosis, and disk protrusion at L4-L5 were noted.  R. 412.

Plaintiff began a six month course of treatment at Meridian Behavioral Healthcare beginning with intake on January 23, 2008.  R. 637, 632.  She said that she had a long history of depression, had poor sleep (sleeping only four hours a night), was easily distracted, and experienced tearful episodes, excessive guilt, nightmares, and intrusive memories.  R. 639.  She related a history of physical violence by her father, causing her to run away from home at age 13.  R. 640.  She was diagnosed as have bipolar disorder, with depressed mood, anhedonia, and decreased sleep; post traumatic stress syndrome, with intrusive memories about her father's physical violence, nightmares, and distractability; and ADHD, with lack of attention and disorganization.  R. 641, 631.

She had treatment on February 27, 2008.  R. 829.  Her most significant issues were anxiety, insomnia, and lack of ability to concentrate.  R. 830.  She also reported that she had chronic fatigue, had difficulty leaving the house, and had significant anxiety.  *Id.*  Another appointment was set for March 24, 2007.  *Id.*  The goal was to increase her GAF score from 50 to 60.  R. 632.

On March 18, 2008, Plaintiff had another MRI of her cervical spine.  R. 702.  The result was the same as the MRI on January 16, 2007: there was no convincing evidence of root or cord compression, but there were spondylotic changes at C5-C6 and mild bilateral C6 foraminal stenosis.  *Id.*  A lumbar MRI of the same date showed stable degenerative changes at L4-L5, with a foraminal disk protrusion that was not contacting the nerve root.  R. 703.  A dorsal MRI revealed little change from the January 16, 2007,

MRI.  R. 704.  There was a mild disk protrusion at T10-T11, with no compression of the dorsal cord.  *Id.*

On March 31, 2008, Plaintiff was seen again at Meridian.  R. 690.  She was still having trouble sleeping at night.  R. 691.  Her mood was depressed, and her affect was restricted.  *Id.*  She was to begin individual counseling.  R. 695.  A GAF score of 50 was assigned.  *Id.*

On April 4, 2008, Robert A. Greenberg, M.D., performed another consultative examination of Plaintiff.  R. 663-664.  Dr. Greenberg felt that Plaintiff was not putting forth a full effort during strength and range of motion testing.  R. 664.  He said that she had decreased range of motion of her cervical spine, right shoulder, lumbar spine, and full range of motion of all other joints.  *Id.*  The straight leg raising test was positive for pain on the left at 15 degrees and on the right at 30 degrees.  *Id.*  Her grip strength and fine manipulation were normal.  *Id.*  He did not find evidence of inflammatory arthritis. *Id.*  His impression was generalized osteoarthritis and fibromyalgia.  *Id.*

On April 29, 2008, Plaintiff was again treated at Meridian.  R. 692.  She said that she had become more irritable taking Lamictal, but her concentration had improved.  R. 693.  She said that her pain continued to interrupt her sleep.  *Id.*

On May 8, 2008, Plaintiff was seen by Steven M. Bailey, M.D., a neurosurgeon, on a consultative basis.  R. 685.  Dr. Bailey said her range of motion was slightly restricted in the neck.  R. 686.  Plaintiff had multiple areas of tenderness in most joints, but the straight leg test was negative for pain.  *Id.*  Dr. Bailey found Plaintiff's strength to be intact (5/5) in both upper and lower extremities, with normal bulk and muscle tone

and without spasticity.  *Id*.  The recent MRIs were not available for Dr. Bailey.  *Id*.  Dr. Bailey's impression was cervicalgia and lumbago, with possible radiculopathy.  *Id*.

On May 12, 2008, Dr. Bailey wrote a follow-up note stating that Plaintiff had multiple areas of tenderness and decreased range of motion in her neck, but no evidence of myelopathy.  R. 684.  He looked at the MRIs and said that he thought that Plaintiff was "best suited for a course of back strengthening, neck strengthening and massage."  *Id*.  He said that follow-up with him (i.e., surgery) was not required.  *Id*.

On June 7, 2008, Plaintiff returned to Meridian.  R. 726.  She was depressed but her affect was euthymic.  R. 727.  She had not seen her therapist in the past month.  *Id*.

On June 24, 2008, Sarah Frazier, M.D., completed a mental assessment of Plaintiff's ability to do work related activities.  R. 696-698.  Dr. Frazier said that Plaintiff had good ability to do a number of work related activities, and fair ability to do others.  R. 698-699.  She did not rate Plaintiff's abilities to be "poor" in any category.  *Id*.  It was noted that Plaintiff reported chronic pain and fibromyalgia, and a GAF score of 55 was assigned.  R. 700.  Dr. Frazier said that Plaintiff was currently anxious and depressed, and said she was "unable to comment on [her] ability to engage in the working environment."  R. 701.

On July 23, 2008, Plaintiff returned to Meridian for counseling.  R. 724.  Her mood was anxious and her affect was mildly dysphoric.  R. 725.  The treatment plan included an increase of Neurontin, continued Cymbalta, Diazepam, Strattera, and therapy.  *Id*.

Plaintiff was seen on July 24, 2008,  at Shands Rehab Center for urinary and bowel incontinence.  R. 720-721.  The person who prepared the report found that this condition severely restricted Plaintiff's ability to shop, work, or leave the house.  *Id.*  The clinical impression was pelvic floor dysfunction.  R. 721.

On September 11, 2008, Plaintiff was seen by Gloria Chin, M.D., for carpal tunnel syndrome.  R. 793.  Dr. Chin said that Plaintiff had "the classic symptoms of dropping things as well as her hands fall asleep while she [is] driving."  *Id.*  Dr. Chin said that Plaintiff was an excellent candidate for right open carpal tunnel release, but she referred Plaintiff back to Dr. O'Meara for cardiac clearance.  *Id.*

On October 8, 2008, Dr. Bailey wrote another follow-up note.  R. 791.  Dr. Bailey noted that Plaintiff had had problems with urinary and bowel control for years, and that should have been in his earlier report.  *Id.*  He said that surgery was not indicated, and "would more than likely increase her symptoms."  *Id.*  She had been going to physical therapy, "which definitely provides her some relief."  *Id.*

On October 27, 2008, Plaintiff was seen again by Dr. DePaz.  R. 785.  Plaintiff said that her conditions were growing worse, and her carpal tunnel syndrome on the right more than the left was becoming worse.  *Id.*  Dr. DePaz noted the March 18, 2008, MRI results.  *Id.*  He noted an x-ray of Plaintiff's left hip on October 27, 2008, which was normal.  R. 786.  Motor strength was normal, and straight leg raising and Spurling's sign[12] were negative.  R. 787.  Dr. DePaz said:

---

[12] Spurling's sign is a test is used for evaluation of cervical spine radiculopathy.  The patient laterally bends the neck to each side while maintaining a posture of cervical extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.

> The patient presents with a picture of fibromyalgia, degenerative disc disease, carpal tunnel syndrome and COPD, as well as psychiatric overlay of bipolar and ADHD.  The multiplicity of diagnoses would have a negative impact on her ability to perform on a daily basis in any rigorous activity or employment.

R. 787. He said that her activity level was limited to "light sedentary with no repetitive bending, twisting, or lifting greater than 10-15 lbs."

On November 3, 2008, Dr. DePaz filled out a physical capabilities evaluation form.  R. 789-790.  He said he could not answer as to how long in an 8 hour days Plaintiff could sit, stand, or walk.  R. 789.  He said that Plaintiff could occasionally lift and carry up to 10 pounds.  *Id.*  He said that Plaintiff could not use either of her hands repetitively for simple grasping, pushing and pulling, fine manipulation, or hand twisting.  R. 789.  He said that Plaintiff could not work full time in a consistent 40 hour week in a job that involved physical duties without causing weakening physical reactions, excessive physical hardship, or excessive pain.  R. 790.  He concluded that Plaintiff could work in light capacity on an irregular basis no more than 20 hours per week.  *Id.*

**Legal analysis**

**Whether the ALJ gave reasons supported by substantial evidence to discount the opinion of Dr. DePaz**

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  This is so because treating physicians:

---

UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at:
http://www.med.ufl.edu/rheum/rheumTests.htm

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th

Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").

The ALJ discounted the opinion of Dr. DePaz because the objective evidence of physical impairments was too limited to establish the degree of disability described by Dr. DePaz. R. 70. The ALJ faulted Dr. DePaz for failing to "frankly address the paucity of the objective evidence compared to the claimant's subjective complaints and self-reported symptoms." *Id.* The ALJ reasoned these "inconsistencies" raised "implied questions regarding the doctor's accuracy or objectivity," musing that this might be because a physician is predisposed to believe the patient's presentation since the physician's first duty is to relieve suffering. *Id.*

The last reason for discounting Dr. DePaz's opinion is wrong as a matter of law. That a treating physician, by professional oath, has sympathy for the patient and wishes to alleviate suffering does not detract from the physician's credibility. Indeed, the reverse is the law of this circuit. A treating physician's opinion must be given *great* weight, absent good reasons to conclude to the contrary.

Likewise, that a patient "self-reports" symptoms is not, standing alone, a reason to discount a treating physician. A physician usually begins with subjective reports from the patient. The pertinent issue is whether Dr. DePaz's opinion is supported by or contrary to the objective medical evidence in the record. The ALJ obviously thought that Dr. DePaz's opinion was not supported by objective medical evidence, and perhaps contrary to other objective medical evidence, but the reasons for that belief were not articulated as required in this circuit. The medical evidence had been accurately

reported earlier in the opinion, but none of that evidence was again mentioned by the ALJ as a basis for discrediting Dr. DePaz's opinion.  Counsel for Defendant has sought to fill in this gap in Defendant's memorandum, doc. 19, p. 6, but after the fact reasoning is not permitted.  My review is confined to the ALJ's decision.[13]  A remand is needed for that purpose.

On remand, several matters in particular should be reconsidered.  First is the diagnosis of fibromyalgia.  The ALJ determined at step two that Plaintiff has the "severe" impairment of fibromyalgia.  R. 61.  Dr. Sharma, who works with Dr. DePaz as a pain specialist, noted that Plaintiff had multiple pain trigger points and determined that Plaintiff has fibromyalgia.  Dr. Bailey also determined that Plaintiff had multiple points of "tenderness."  Other physicians had diagnosed fibromyalgia in earlier years and that diagnosis has been consistently entered in the medical history.  On June 21, 2007, Dr. LaMadrid, another treating physician, thought that Plaintiff is totally and permanently "disabled" and likely never to return to work in any occupation due to fibromyalgia.  R. 730.

───────────────

[13] On administrative review of an action of an agency of the Executive Branch, this court may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001); Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline, however, to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making.") (citing Chenery); McDaniel v. Bowen, 800 F.2d 1026, 1032 (11th Cir. 1986).

Chronic pain, multiple painful points on the body, fatigue, and sleep deprivation are hallmark symptoms of fibromyalgia:

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 Fed.Appx. 748, 762 (11th Cir. Jul 09, 2008) (not selected for publication in the Federal Reporter, No. 07-11648).  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court there said:  "Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id.*

A patient's subjective complaint "is an essential diagnostic tool" for the treating physician.  Green-Younger v. Barnhart, 335 F.3d at 107, *quoting* Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).  Moreover, it is relevant to the weight of a treating physician's opinion that he or she have "personally monitored the effectiveness of various therapies and found that they failed to provide any significant improvement . . . ."  *Id.  See* Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating physician's opinion not conclusory when it was the "culmination of

numerous visits [plaintiff] had with her past doctors, and his experience with treating her chronic pain.").

It is a misunderstanding of the nature of fibromyalgia to require " 'objective' evidence for a disease that eludes such measurement." Green-Younger, 335 F.3d at 108; Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10, 2009) (not selected for publication in the Federal Reporter, No. 07-14901). "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.' "Green-Younger, 335 F.3d at 108 (citations to cases from the 6th, 8th, and 9th Circuits omitted). "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Id., at 108-109. "[S]welling of the joints is not a symptom of fibromyalgia . . . ." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). See also Brown v. Barnhart, 182 Fed.Appx. 771 (10th Cir. 2006) (not selected for publication in the Federal Reporter, No. 05-5143). The Eleventh adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000). In Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005), while acknowledging that Stewart is not binding precedent, the court said:

> In Stewart, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on a individual's described symptoms. Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment. Id. 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.

405 F.3d at 1211 and n. 3.

The evidence in this case is that Plaintiff has suffered sleep deprivation, fatigue, and has had multiple tender points for quite some time. A diagnosis of fibromyalgia by may not be discounted because these symptoms are "self-reported" or that objective tests do not confirm the diagnosis. On remand, the ALJ must credit the diagnosis of fibromyalgia and consider the effects of that impairment upon Plaintiff's ability to do work.

If the ALJ determines that Dr. DePaz has not adequately explained his opinion, then the ALJ should take steps to resolve the problem by gathering additional information from Dr. DePaz. The Commissioner's regulations provide that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available. *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved , the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.* We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1) (emphasis added). *See also*, Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.

1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte."))

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000).  Further inquiry from Dr. LaMadrid, another treating physician, may also be warranted.

Additionally, Plaintiff's impairments must be evaluated in combination.[14]  Dr. DePaz explained that his opinion as to Plaintiff's inability to work more than 20 hours a week was based upon consideration of all of her diagnosed maladies, *in combination.* Fibromyalgia was one, but Plaintiff has been diagnosed with chronic depression, attention deficit disorder (difficulties with concentration), post traumatic stress syndrome (probably from physical abuse by her father when she was a child), chronic obstructive pulmonary disease (probably from smoking tobacco), urinary and bowel incontinence, bilateral carpal tunnel syndrome, and mild degenerative changes in her spine, with

---

[14] All impairments, whether "severe" or not, must be evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.

protrusions at two levels (probably from old motor vehicle injuries).[15]  While any one of these impairments may not cause disability, the combination may.

There is evidence that each of these impairments has had some significant effect upon Plaintiff's residual functional capacity.  In particular, Dr. LaMadrid found that Plaintiff suffers from depressed mood, poor concentration, and poor immediate and recent memory.  R. 421.  There are repeated references in the medical record to episodes of crying during treatment.  Dr. LaMadrid thought that Plaintiff needed a structured job with a schedule, but he also thought that she "may not work due to unstable depression."  *Id.*  Plaintiff has been diagnosed while in treatment at Meridian as having attention and organizational deficits. R. 641, 631.  Further, the ALJ determined that Plaintiff has moderate limitations in concentration, persistence, and pace.

In addition to these moderate mental impairments and the pain and fatigue of fibromyalgia, Plaintiff suffers from urinary and bowel incontinence.  When Plaintiff was seen at Shands Rehab Center for evaluation of her urinary and bowel incontinence, it was noted that this condition severely restricted Plaintiff's ability to shop, work, or leave the house.  R. 720-721.

A remand is needed, therefore, for reconsideration as to all of these issues.

---

[15] If this were only a case of pain caused by degenerative disc disease, the MRI evidence and the negative spinal testing evidence perhaps would be sufficient to undermine Plaintiff's testimony as to symptoms.  Still, the MRIs still show two disc protrusions and it is possible that those cause some pain.

**Whether the ALJ provided adequate reasons to disbelieve Plaintiff's subjective testimony**

"If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so."  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).   "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true."  Wilson v. Barnhart, 284 F.3d at 1225.

The Administrative Law Judge determined that Plaintiff's testimony as to her symptoms was not supported by objective medical evidence, but he did not say why.  R. 70.  He did not correlate the objective medical evidence that was to the contrary, and he did not discuss the objective medical evidence that supported Plaintiff's testimony.

On remand, the ALJ must first reconsider the opinion of Dr. DePaz and, if again rejected, provide reasons supported by substantial evidence in the record.  The ALJ must consider all of the medical evidence, the kinds of treatment which Plaintiff has sought, and the success, if any, of that treatment.  As noted above, all impairments must also be considered in combination, and the diagnosis of fibromyalgia must not be rejected simply because it is based upon Plaintiff's subjective report of symptoms..  If the opinion of Dr. DePaz is credited, then it should follow that the ALJ credits Plaintiff as well.  In any event, on remand the ALJ must articulate the reasons for discounting Plaintiff's testimony.

**Whether the ALJ erred by failing to account for Plaintiff's moderate concentration limitations into his residual functional capacity determination**

The Administrative Law Judge determined that Plaintiff has moderate difficulties with regard to concentration, persistence, or pace.  R. 62.  This finding was supported by a state agency psychologist's opinion after review of the records.  R. 67.

The ALJ attempted to account for those moderate limitations in his residual functional capacity determination by finding that Plaintiff could not do work requiring executive or management decisions.  R. 63.  He then posed a hypothetical to the vocational expert that limited the hypothetical person to jobs not requiring executive or management decision making.  R. 881-882.  He further explained that the person would be able to do low semi-skilled work with an SVP of 4 or 5, but with "no long range decisions, planning, operational planning, strategic planning, that sort of thing."  R. 882.  He did not add a limitation due to moderate difficulties with regard to concentration, persistence, or pace.

This was error.  An impaired ability to concentrate, to persist in a task, or to keep up pace, is different from an impaired ability to think through complex issues, to formulate a plan, or to make a management decision.  It is not a skill level problem.  Further, a limitation to simple, routine work, or to work at some other skill level, does not account for the limitation.  The developing case law directs that if there is a moderate limitation in concentration, persistence, or pace, that limitation must be stated in the hypothetical presented to the vocational expert.  Winschel v. Commissioner of Social Sec., *supra*, 631 F.3d at 1179-1180; Vuxta v. Commissioner of Social Sec., 194

Fed.Appx. 874 (11th Cir. Sep 8, 2006) (not selected for publication in the Federal Reporter, No. 06-11768); Richter v. Commissioner Of Social Security, 379 Fed.Appx. 959 (11th Cir. May 21, 2010) (not selected for publication in the Federal Reporter, No. 09-12674); Nakas v. Astrue, 2010 WL 4038742 (N.D. Fla. Sep 17, 2010) (No. 5:09CV358-RS/WCS), report and recommendation adopted, 2010 WL 4038761 (N.D. Fla. Oct 14, 2010) (discussing Vuxta and Richter).  A remand is needed for this purpose.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law.

Accordingly, it is **ORDERED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **REVERSED** and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

**DONE AND ORDERED** on January 18, 2012.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE**